RICHARD H. GOLUBOW – State Bar No. 160434
rgolubow@wghlawyers.com
PETER W. LIANIDES – State Bar No. 160517
plianides@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone:   (949) 720-4100
Facsimile:   (949) 720-4111

[Proposed] General Insolvency
Counsel for Lorna Jane USA, Inc.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>LORNA JANE USA, INC., a California corporation,<br><br><br>            Debtor-in-Possession. | Case No. 2:21-bk- 17267-NB<br><br>Chapter 11 Proceeding<br><br>**DECLARATION OF RICHARD MUNRO IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**<br><br>Date:    TBD<br>Time:    TBD<br>Place:   255 East Temple Street<br>            Courtroom 1545<br>            Los Angeles, CA 90012 |

I, Richard Munro, declare and state under penalty of perjury as follows:

1. The matters set forth herein are within my own personal knowledge, and, if called upon as a witness, I could and would competently testify thereto.

2. I through my company Invenz, Inc., have been retained to serve as the Chief Restructuring Officer ("CRO") of Lorna Jane USA, Inc., a California corporation, the debtor-in-possession ("Debtor") in the above-captioned chapter 11 case ("Chapter 11 Case").

3. In my capacity as CRO, I am familiar with the Debtor's daily operations and books and records, and submit this Declaration in support of the first day motions ("First Day Motions") filed in the Debtor's Chapter 11 Case.

4. My professional biography is attached hereto as Exhibit "1" and incorporated herein by this reference. As set forth in more detail in my biography, I earned an M.B.A. degree from Auckland University, and a Bachelor's degree in Accounting and Management Information Systems from the University of Canterbury. I am a licensed Chartered Accountant (CA) of Australia and New Zealand and hold a California Real Estate Broker License 01900072.

5. In addition to serving as the Chief Executive Officer ("CEO") of Invenz, I am the President / CEO of the National Association of Corporate Directors ("NACD"), Pacific Southwest Chapter ("PSW"). The NACD PSW Chapter serves almost 2,000 NACD members providing corporate director education, and director peer networking opportunities. I am also Directorship Certified by NACD, and a Board Leadership Fellow of NACD, both of which are recognized globally as gold standards of corporate director excellence and achievement.

6. In addition to my credentials summarized above, I have more than thirty (30) years of experience in the receivership and corporate restructuring and turnaround industry, and in overseeing a myriad of companies, property, and assets, and creating significant increased profitable growth, cashflow, and recoveries for the benefit of lenders, creditors, and equity interest holders.

7. My experience includes serving as financial adviser to companies and individuals; holding senior executive positions as CEO in public and privately held companies, Chief Financial Officer, Chief Operating Officer, and CRO in privately held companies; serving as a member of the board of directors for public and privately held companies; and serving as a State Court Appointed

2

Receiver, and State Court Appointed Provisional Director.  In one instance I was the CEO of a public company as debtor in possession in Chapter 11, and supervised a successful plan of reorganization, which resulted in a confirmed plan and exit from Chapter 11 bankruptcy.  In the various capacities identified above, I have led, overseen or principally managed financial restructurings, and orderly wind downs and liquidations of numerous businesses in and out of court.

8.    I have also served as a state court designated financial expert witness to assess and opine on a company's financial performance for the Court.

9.    This Declaration is intended to provide the Court and parties-in-interest with an understanding of the Debtor's business and the circumstances that precipitated the Chapter 11 filing, as well as to support the various factual bases for the First Day Motions that have been filed in connection with the Chapter 11 Case. The First Day Motions are necessary to facilitate an orderly and effective transition into and through chapter 11 while minimizing the disruption to the Debtor's business operations.

10.    Unless otherwise stated, all facts set forth herein are based on my personal knowledge, my review of relevant documentation of the Debtor, information provided to me by the Debtor's employees and professionals and representatives of the Debtor's affiliates or related entities, or my opinion based on my experience and knowledge with respect to the operations and financial affairs of the Debtor.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

11.    I have served as the CRO of the Debtor since August 4, 2021. As CRO of the Debtor, I oversee the financial and operational restructuring of the day-to-day operations of the Debtor.

12.    To familiarize the Court and parties-in-interest with the Debtor, the relief sought in the various First Day Motions, and the Debtor's need to restructure through chapter 11, this Declaration is organized in the following sections:

a.    Part I provides an overview of the Debtor's business, including its history, corporate structure, and business operations.

b.    Part II discusses the Debtor's capital structure, including its assets and liabilities.

`

c.    Part III addresses the events precipitating the Debtor's Chapter 11 filing and the Debtor's goals for the case.

d.    Part IV provides an overview of the First Day Motions.

**PRELIMINARY STATEMENT**

13.    The Debtor is a women's athletic apparel and accessories retail chain that was established to sell and promote the internationally renowned Lorna Jane products brand in the United States through boutiques in various states, and its website.  Like most retailers in the United States, the Debtor has been impacted by the COVID-19 and related Delta variant pandemic, which has significantly limited retail operations throughout the country and suppressed consumer willingness to shop in person.  Indeed, the Debtor's retail revenue for its fiscal year beginning July 05, 2021, year to date (July to August 2021), and in the twelve months ending June 30, 2021 decreased by 57% and 55%, respectively, compared to fiscal year 2019 (pre-pandemic era).  The Debtor believes that these changes in consumer shopping habits will endure even after the pandemic subsides, continuing to impact brick-and-mortar retail into the future.

14.    Even prior to the pandemic, the Debtor was experiencing a decline in sales revenue from its brick-and-mortar retail boutiques, while its e-commerce revenue has dramatically increased. Consequently, the Debtor's lease obligations were becoming increasingly untenable and prompted the Debtor to assess and gradually reduce its lease portfolio. The profound and sustained impact of the pandemic, however, has forced the Debtor to more aggressively address the rapidly widening gulf between its brick-and-mortar retail boutique revenue and its substantial lease obligations, which no longer reflect the market. To this end, the Debtor diligently attempted to negotiate new lease terms with its landlords in the hope of achieving an out-of-court restructuring. Landlords, however, have been reluctant to negotiate the type of long-term adjustments to leases that are necessary to ensure the Debtor's continued viability.

15.    After much deliberation, the Debtor has determined that restructuring through chapter 11 presents the best means for the Debtor to address its challenges and promote sustained success. Most particularly, through this Chapter 11 Case, the Debtor intends to reject its remaining leases for its retail boutiques in order to right-size its business to better position itself for long-term

success and profitability.  It is believed that such efforts will enable the Debtor to better adapt in light of the pre-pandemic shift to online purchasing as well as the impact of the COVID-19 and Delta variant pandemic on brick-and-mortar retail sales.

## THE DEBTOR'S BUSINESS

16.    The Debtor is a retailer in the United States of a wide range of high-quality affordable women's athletic apparel and accessories for active living including collections offered for yoga, running, gym and cross-training, tennis, travel, maternity, lifestyle and work from home. Through its website, and until recently through its boutiques, the Debtor sells Lorna Jane branded product that is designed in Australia and manufactured in China.

## CORPORATE PARENT AND PHILOSOPHY

17.    The Debtor is the wholly-owned subsidiary of LJ USA General Partnership ("Partnership").  Partnership is owned equally by LG GP No. 1 Pty, and Ltd LG GP No. 2 Pty Ltd, both organized under the laws of Australia, that are each wholly owned by Lorna Jane PTY Ltd ("International"), which is also organized under the laws of Australia, and headquartered in Brisbane, Queensland, Australia.

18.    The Lorna Jane brand was originally founded in 1989 in Brisbane, Australia by Lorna Jane Clarkson.  Ms. Clarkson was an aerobics instructor in Brisbane, Australia.  Frustrated with the boring and unflattering workout fashion of the 1980s, she started designing "Activewear", a term she coined, to reflect her passion to inspire women to be more active.  So, she took a pair of scissors to her favorite swimsuit to discover how it was made, and the first ever piece of Lorna Jane Activewear began to take shape.  Ms. Clarkson's aerobics students took notice of her designs and started asking for custom orders. Soon, overwhelming demand led to opening the first Lorna Jane store in 1993 in Brisbane, Australia.

19.    Under stewardship of Ms. Clarkson, and her husband William "Bill" Clarkson, by 2011 the 100th Australian based Lorna Jane store was opened.  In 2012, Lorna Jane went global by opening its first United States based store, with a strategy of internationalization through opening stores and showrooms throughout the globe that shared and helped promote the award-winning Lorna Jane brand, and Lorna Jane's daily practice of the Active Living™ philosophy that it stands by -

Move, Nourish, Believe.  Move your body every day.  Nourish from the inside out. Believe that anything is possible.

20.    In combination with and through its affiliates, International has boutiques and showrooms in Australia, New Zealand, North America, Europe, and Asia, and also sells products through its affiliates' web platforms.

21.    At the heart of Lorna Jane is a commitment to sustainability.  Lorna Jane respects both humankind and the environment. Importantly, Lorna Jane is driven to ensure that its communities, planet and environment are just as healthy as the women that wear its Activewear.

22.    Neither Partnership, International, nor any affiliates, have commenced chapter 11 or insolvency proceedings.

## THE DEBTOR'S OPERATIONS

23.    The Debtor was formed and incorporated in the state of California on or about September 30, 2011 as a means to expand the Lorna Jane brand in the United States.  Market research revealed that the success of International could be emulated in the United States based on the unique product range, coupled with the more than 20-year history and Australian heritage of the Lorna Jane brand.  The strategy hinged upon opening retail stores in strategic locations in California and expand north and east as time progressed.  The initial research through fitness trade shows and product marketing to established institutional landlords yielded promising feedback in both brand resonance as well as future growth potential.

24.    With growing demand for yoga and fitness apparel, Lorna Jane Activewear was the ideal product to introduce to the US market as a viable alternative to established brands such as Lululemon.  California was selected as the initial entry point based on the similarity of weather/climate to Brisbane, Australia, and hence the product relevance, the engaged clientele and the size of the target market.

25.    In 2012 the Debtor opened its first boutique in the United States in Santa Monica, California.  Until recently, the Debtor operated 22 retail boutiques in 5 states[1] at which the Debtor sold Lorna Jane branded women's activewear and accessories. The boutiques were located in regional

---

[1] California, Arizona, Texas, Utah, and Washington

malls, several street-front locations, and outlet centers.  The Debtor also sells products directly to customers through its website, https://www.lornajane.com/.  As of the fiscal year that ended on July 4, 2021, the Debtor comprised 7.69% of International's consolidated sales.

26.    The Lorna Jane branded products are sold by the Debtor under license owned by International, which works directly with a reliable and ethical manufacturing group that manufactures Lorna Jane products sourced in China. The sourcing of the Lorna Jane brand products is important to ensure that the products used are of the highest quality, and sourced as sustainably as possible.

27.    The Debtor maintains its headquarters and a primary distribution center at 1475 W. 139th Street, Gardena, CA 90249 ("Distribution Center"), from where it ships its products directly to customers, and formerly to its retail boutiques.

## CAPITAL STRUCTURE

### A.    Assets and Liabilities

28.    As of the Petition Date, the Debtor's balance sheet reflects approximately $5,084,663 in assets and approximately $5,105,189 in liabilities, excluding debts owed to insiders or affiliates. The Debtor realized after filing its Chapter 11 Petition, Schedules and Statement of Financial Affairs with the Court, that the value shown for Debtors Office furniture, fixtures, and equipment, and collectibles, was inadvertently overstated.  The value shown at line 86, Part 12, Schedule A&B should have been $275,236, not $1,975,236, and the value of Total of all property on Schedule A/B at line 92, Part 12, should be $5,084,662.89, not $6,784,662.89.  The Debtor will amend Schedule A/B in the near future.

29.    The Debtor does not own any real estate.  Its assets primarily include cash, Lorna Jane branded inventory, with nominal value attributed to information systems and computer technology equipment, transit/delivery vehicles, and fixtures and fittings at its various retail store locations.

30.    The Debtor's assets are not encumbered by or otherwise subject to any to liens or secured obligations. Other than the sales revenue it generates, the Debtor's chief financing source is International, and a sister-company LJ USA Holdings, Inc., a California corporation ("Holdings"), which is a wholly owned subsidiary of Partnership.  International and Holdings have provided capital

assistance to the Debtor over the years in the form of periodic unsecured loans intended to assist the Debtor fund operating shortfalls.   This arrangement has provided funding to the Debtor so that the Debtor may promote and sell the Lorna Jane brand in the United States without the Debtor having to leverage its assets. As of the Petition Date, Holdings and International are by far the Debtor's largest unsecured creditors, as they are owed approximately $32,292,000, and $9,852,744, respectively, for monies loaned.

31.    Outside of Holding's and International's claims, the Debtor's largest liability is to its landlords. As noted, the Debtor does not own any real estate. Instead, the Debtor leases all of its retail boutique locations, as well as its Distribution Center under operating leases that expire on various dates, with the longest lease term expiring in 2029.

32.    As of the Petition Date, the aggregate amount of annual and monthly gross rent due to landlords on all leases is approximately $4,382,000 and $365,263, respectively.  As of August 31, 2021, the Debtor's total remaining lease obligations under the terms of its current leases is approximately $14,913,000.  As of the Petition Date, the Debtor is currently $2,100,697 in arrears on its leases.  Landlords are holding approximately $249,585 in security deposits. As discussed below, the Debtor's primary goal in chapter 11 is to right-size its United States presence in part by rejecting all retail boutique store leases to enable the Debtor to better adapt and cultivate sustained profitability in light of the increasing shift to online purchasing and the impact of the COVID-19 pandemic on brick-and-mortar retail sales.  It is anticipated that the total amount of unsecured claims in this case will increase as leases are rejected.[2]

33.    As of the Petition Date, the Debtor is current on sales and use taxes. For the months of January through August 2021, the Debtor paid a monthly average of $64,155 in sales and use taxes.

---

[2] Additional unsecured claims against the Debtor are believed to be minimal and include: (i) accrued and unpaid trade and other unsecured claims incurred in the ordinary course of business; and (ii) unpaid accounts owed to the Debtor's vendors and suppliers in the ordinary course of business. The Debtor has typically paid such debts as they have come due, and thus most liabilities owed to vendors and suppliers as of the Petition Date comprise recent balances. It is therefore anticipated that certain vendors and suppliers may have administrative priority claims under section 503(b)(9) of the Bankruptcy Code for the value of unpaid goods received by the Debtor within 20 days of the Debtor's Chapter 11 filing.

**B.    Sales**

34.    For the Debtor's fiscal year beginning on July 5, 2021, through August 29, 2021, the Debtor's net sales were approximately $1,503,000, down nearly 47% from approximately $2,855,000 in net sales for the same period in FY2020.

35.    Although the Debtor was experiencing a shift to e-commerce sales prior to the COVID-19 pandemic, the trend greatly accelerated during the pandemic due to emergency government orders closing or limiting retail store operations for prolonged periods and general consumer reluctance to shop in person. In 2019, brick-and-mortar retail sales comprised 69% of the Debtor's overall sales. However, for 2020, a time nearly entirely encompassing the pandemic, brick-and-mortar retail sales declined by 56% and comprised just 49% of the Debtor's total sales. Meanwhile, in 2020, the Debtor's e-commerce sales have dramatically increased by 62%, and have gone from comprising 18% of the Debtor's overall sales (in 2019) to 47%.

36.    Additionally, almost all of the Debtor's products and inventory are imported and processed through the Distribution Center. The amount of imported products that the Debtor accounted for during the COVID-19 pandemic, in both value and quantity, declined sharply. Specifically, in 2019 the Debtor accounted for 441,610 in quantity and $7,321,812 in value. In 2020, the Debtor declared 198,622 in quantity and $3,290,058 in value in its accounts. Whereas through August 31, 2021, the Debtor declared 144,500 in quantity and $2,591,683 in value. This further evidences the significant impact that the pandemic has had on the Debtor's sales and therefore the drastic reduction in inventory purchases year on year.

**C.    Employees**

37.    The Debtor's employees have been central to its success. However, due to the decision to reject retail leases, the natural consequence was the need to terminate all employees except those that work at the Distribution Center. As of the Petition Date the Debtor employs approximately ten (10) full-time employees. The employees serve to support the Debtor's operations at the Distribution Center, and its online shopping platform. As detailed below in the summary below, and more thoroughly in the Employee Obligations Motion, the Debtor offers employees various benefit policies and options.

`

38.    The Debtor's payroll is made on a bi-weekly basis. The most recent payroll, totaling approximately $115,600, was made on September 14, 2021, which includes payment in full of all wages owed to all employees terminated just prior to the Petition Date. The Debtor's first post-petition payroll will be made on September 23, 2021, and the total amount be expected to be paid is $20,910, of which approximately $11,400 is for compensation earned prior to the Petition Date.

39.    As of the Petition Date, the Debtor is current on all payroll taxes by way of remitting all dues on each pay cycle to our third-party Payroll Service Provider, who in turn, remits to the various Government Agencies in a timely manner. Approximately $7,500 will be due on the Debtor's next payroll date, September 23, 2021, of which approximately $4,100 is payroll taxes for employee compensation earned before the Petition Date (and of that amount, approximately $2,700 is for statutory deductions, and $1,400 employer taxes).

### D.    **Insurance Policies**

40.    The Debtor also maintains several insurance policies, including for, among other things, (a) Property / Boiler & Machinery, (b) General Liability, (c) Automobile, (d) Workers' Compensation / Employee Liability, (e) Umbrella/Excess Liability, (f) FINPRO  including:  D&O, Fiduciary, Employment Practices, Crime, and Special Risk; (g) a Foreign Package  including: Commercial GL, Contingent Commercial Auto, Employee Benefits, Employers  Responsibility, Contingent Employers Liability, Accidental Death & Dismemberment, Special Risk; and (h) Cyber. The Debtor has paid the premiums for these up to and including August 2021; the policies are valid through to December 6, 2021 with premiums paid monthly to Travelers (items a to c, above) and Berkshire Hathaway (item d, above). Insurances for Items (e) to (h) above are maintained at a Group level through International.

### EVENTS PRECIPITATING FILING AND GOAL IN CHAPTER 11

41.    As has been the case with brick-and-mortar retailers across the United States and the rest of the world, the unprecedented COVID-19 pandemic has substantially and negatively affected the Debtor's business and has greatly accelerated the need for a long-term strategic solution. In particular, due to state and local emergency orders issued during the pandemic, the vast majority of the Debtor's retail boutiques were either operating with reduced hours or capacity, or were closed

entirely for extended periods. Due to the pandemic and the resulting government restrictions, the Debtor made the business decision to close all of its stores in mid-March 2020. Between June 2020 and September 2020, most of the Debtor's retail boutiques gradually re-opened depending on the status of local restrictions and conditions. When locations were re-opened, virtually all were operating with reduced hours and capacity limitations based on local restrictions and conditions. Consequently, as noted above, retail sales from the brick-and-mortar locations precipitously declined by 55% over the 12 months ending June 30, 2021, in comparison to the same period in 2019. Sales during June to August 29, 2021, declined 55% when compared to the same time in 2019.

42.    The pandemic also understandably suppressed consumer willingness to shop in person, particularly in indoor malls where the bulk of the Debtor's retail boutiques are located and social distancing is difficult.  Consequently, consumer habits have changed and there has been a decided accelerating shift away from in-person retail shopping in favor of online purchasing that is predicted to endure even after the pandemic subsides.  As noted above, the Debtor's e-commerce sales have risen by 69% compared to pre-pandemic levels and now comprise 47% of the Debtor's overall net sales, while brick-and-mortar retail sales have fallen from nearly 56% of the Debtor's total net sales to just 49%.

43.    The world has been forever changed by the pandemic. The Debtor is now saddled  with hefty lease obligations that were entered into under circumstances completely different from  where we are today, under which the societal altering impact of the pandemic was never  anticipated. Even so, the Debtor was experiencing a decline in brick-and-mortar retail sales prior  to  the  pandemic  that was becoming increasingly untenable, leading to the Debtor's efforts to  adjust its brick-and-mortar presence. The pandemic has expedited this issue, further highlighting  that the lease obligations have become an albatross around the Debtor's neck.

44.    In the face of the mounting financial difficulties of the pandemic, the Debtor's management instituted various mitigation measures, including implementing recurring reviews  of its workforce needs which led to reducing workforce (including at the corporate office level)  either permanently in some cases or through furloughs, consolidating roles, reducing marketing expenses, and halting capital expenditure projects. Unfortunately, the impact of the pandemic  has proven

`

too steep and enduring despite these initiatives, and it has become clear that more holistic efforts

centered on the Debtor's lease obligations are needed to preserve the Debtor long-term. The Debtor

simply is not generating enough revenue from brick-and-mortar sales to meet its lease obligations.

As noted, consumer purchasing habits have changed as a result of the pandemic, and it may be

years before brick-and-mortar retail sales return to pre-pandemic levels, if ever. In the meantime,

the Debtor's lease obligations, which unfortunately no longer accurately reflect the market, will

become an increasingly heavy anchor for the Debtor and may ultimately threaten the Debtor's

viability. Relief in chapter 11, and in particular, the rejection of burdensome leases, is necessary to

enable the Debtor to adapt to the new economic realities with the goal of bolstering the Debtor's

long-term viability and preserving the Debtor's United States market presence.

45.    The struggles in the retail sector during the pandemic have not been unique to the

Debtor, as several other recognizable retail brands, including J. Crew, True Religion Apparel,

Lucky Brand Dungarees, Brooks Brothers, Tuesday Morning, New York & Co., Sur La Table, and

Guitar Center, among others have filed for chapter 11 proceedings since the start of the

pandemic. Several of these entities have specifically sought to reject leases in chapter 11 in an

effort to help right-size and sustain their businesses in light of the pandemic including, but not

limited to J. Crew, True Religion Apparel, Lucky Brand Dungarees, and Brooks Brothers. The

struggles in the retail sector even before the pandemic were not unique to the Debtor, as other

recognizable brands shuttered stores. For example, in 2019, Payless shut down all of its 2,100 stores,

and a year earlier Toys R Us closed all of its 735 stores.

46.    Against this backdrop, in the months prior to the Chapter 11 filing, the Debtor and

its advisors worked tirelessly to solicit and develop strategies to maximize value for its

stakeholders. Most pertinently, the Debtor negotiated diligently with its landlords to reach terms that

would have resulted in an out-of-court restructuring. In particular, the Debtor undertook the

significant effort to renegotiate leases and obtain rent concessions from the Debtor's landlords.

Unfortunately, the Debtor was unable to execute a satisfactory out-of-court restructuring as

landlords generally exhibited reluctance to negotiate long-term adjustments to leases. As of the

Petition Date, seven (7) landlords have commenced actions for amounts due under leases, and others

`

have issued demand letters.

47.     The Debtor did not pay any rent obligations in September 2021, and also did not remit rent on certain other leases in prior months. However, the Debtor has generally paid its vendors, suppliers, service providers, and trade creditors in the ordinary course of its business.

48.     After much deliberation and consultation with its professionals and advisors, the Debtor has determined in its business judgment that restructuring through chapter 11 presents the best avenue for the Debtor to address its challenges and promote sustained success. In particular, through this Chapter 11 Case, the Debtor intends to eliminate its brick-and-mortar footprint through the rejection of burdensome leases in order to restructure and strengthen its financial picture for its go-forward business, including preserving its employees that operate from the Distribution Center. To this end, the Debtor's management team and advisors have determined at the outset of the Debtor's Chapter 11 filing that it is appropriate to close and reject the leases for all twenty-one (21) retail locations. In formulating this list of store closings, the Debtor considered such factors as the location's historic sales in relation to the remaining lease obligations, recent sale trends, the geographic market in which the store is located, the prospects to negotiate rent reduction with the applicable landlords, and other circumstances related to a specific retail boutique's performance.

49.     Although difficult, it is believed that closing boutique retail locations and rejecting leases is necessary especially in light of the new realities brought on by the pandemic, and will help maximize recovery for creditors over time. The Debtor determined it was prudent to act now in order to minimize liabilities from mounting lease obligations that the Debtor cannot fulfill now or in the near-term, and put the Debtor in the best position for long-term success for its various stakeholders through an appropriate right-sizing of the Debtor's business.

## SUMMARY OF FIRST DAY MOTIONS

50.     To minimize the adverse effects of the commencement of the Chapter 11 Case on the Debtor's ability to effectuate an efficient chapter 11 restructuring that will maximize value of the Debtor's estate, the Debtor has filed a number of First Day Motions designed to facilitate a smooth transition into chapter 11.

51.     I anticipate that the Bankruptcy Court will conduct a hearing soon after the

Petition Date at which time the Court will consider the First Day Motions. Certain of the First

Day Motions seek authority to pay prepetition wages and other prepetition claims.  The Debtor

has narrowly tailored its requests for immediate authority to instances where failure to pay such

claims would cause irreparable harm to itself and its estate.

52.    Accordingly, the Debtor requests that the relief sought in each of the First Day

Motions described below be granted, as each request for relief constitutes a critical element in

preserving the value of the Debtor's estate for the benefit of all parties in interest.

53.    I have reviewed each of the First Day Motions with the Debtor's attorneys and

professionals, and the facts stated therein are true and correct to the best of my knowledge,

information and belief. I believe that the relief sought in each First Day Motion is tailored to

meet the goals described above, is necessary and critical to the Debtor's reorganization efforts,

and is in the best interest of the Debtor's estate and creditors. I hereby adopt and affirm the

factual representations contained in each of the First Day Motions. To the extent the First Day

Motions seek authority to pay certain pre-petition claims as necessary to continue the Debtor's

operations, I believe that the Debtor has sufficient availability of funds to pay such obligations.

## DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING THE CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, MAIN OPERATING BANK ACCOUNT, AND BUSINESS FORMS (" CASH MANAGEMENT MOTION")

54.    Pursuant to the Cash Management Motion, the Debtor requests authority to

continue to use  the Debtor's existing (a) Cash Management System and its Main Operating Bank

Account with US Bank, (b)  Business Forms, and (c) implement changes to its Cash Management

System in the ordinary course of  business, including opening new or closing existing bank accounts.

55.    The Debtor uses an integrated, centralized Cash Management System to collect,

concentrate, and disburse funds generated by its operations.  The Cash Management System is

tailored to meet the Debtor's needs as a retail operator with a website. The Cash Management System

enables the Debtor to efficiently collect and disburse cash generated by its online sales, pay its

financial obligations, including to employees, and vendors, monitor and control corporate funds and

available cash, and efficiently obtain accurate account balances and other financial data. Although a

portion of the system is automated, the Debtor's Chief Financial Officer and I will be able to monitor the Main Operating Bank Account (defined below), as well as any other bank accounts maintained by the Debtor, and manage the day-to-day collection and disbursement of funds.

56.    As of the Petition Date, the Debtor maintains the following bank accounts:

a.    An operating account at US Bank, ending in 5516 ("Main Operating Bank Account"). Prior to the Petition Date, the Main Operating Bank Account was the Debtor's primary bank account, which held all deposits of the Debtor's customers and other money received by the Debtor, and was used to make payments to vendors and for general operating expenses as well as Employee payments. As of the close of business on September 15, 2021, the Main Operating Bank Account has a balance of $1,663,032.

b.    An account at Union Bank, ending in 3043 ("Union Bank Account"). Prior to the Petition Date, this account was the Debtor's bank account solely used by the Debtor's Texas stores to deposit cash receipts, which were periodically swept to the US Bank account. As of the close of business on September 15, 2021, this account has a balance of $645.  Now that the retail boutiques are closed, the Union Bank Account is no longer required.

c.    A dormant account at Bank of Hawaii, ending in 2292 ("Hawaii Bank Account"). Prior to the Petition Date, this account had no transactions since 2017. As of the close of business on September 15, 2021, this account has a balance of $39,001.

57.    I believe the relief requested in the Cash Management Motion is in the best interest of the Debtor's estate, its creditors, and all parties-in-interest, and will enable the Debtor  to continue to operate its business in this Chapter 11 Case with minimal disruption. Maintaining  the Cash Management System is critical to the Debtor's successful day-to-day operations,  without which the Debtor would suffer immediate and irreparable harm. For the foregoing  reasons, I respectfully submit that the Cash Management Motion should be granted.

## DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING THE DEBTOR TO PAY CERTAIN TAXES AND FEES IN THE ORDINARY COURSE OF BUSINESS ("TAX MOTION")

58.    The Debtor requests entry of an order authorizing, but not  directing, the Debtor to

`

remit certain taxes and fees owed to the appropriate taxing authorities in  the ordinary course of business, as such payments become due and payable and to the extent  adequate funds are available to make such payments.

59.      In the ordinary course of business, the Debtor incurs and collects from customers state and local taxes charged in connection with the sale of various products to customers ("Sales Taxes").  Further, the Debtor purchases various materials and supplies necessary for the operation of its day-to-day business and incurs use taxes ("Use Taxes" and, together with the Sales Taxes, the "Sales and Use Taxes") in connection with such purchases.

60.      The Debtor remits Sales and Use Taxes generally on a monthly basis. The Debtor uses a third-party service provider, Avalara Inc., through direct integration into its sales channels to calculate, collect and remit Sales and Use Taxes to the appropriate taxing agency.  As noted above for the months of January through August 2021, the Debtor paid a monthly average of $64,155 in Sales and Use Taxes.  As of the Petition Date, the Debtor believes it is current with respect to its payment of Sales and Use Taxes, however the Debtor estimates that $95,058 in Sales and Use Taxes will be owed for the month of August and for the pre-petition portion of September and payable after the Petition Date.  To the extent any pre-petition Sales and Use Taxes are owed to taxing authorities, such taxes are not property of the estate but, rather, are held in trust for the taxing authorities ("Authorities").  The Debtor seeks to pay the prepetition Sales and Use Taxes in order to, among other things, prevent the Authorities from taking actions that might interfere with the administration of the Debtor's Chapter 11 Case, including bringing personal liability actions against the Debtor's officers and directors or other key employees or assessing penalties or interest on past due taxes. Additionally, if the Debtor does not pay the Sales and Use Taxes that it owes, it may give rise to a priority claim pursuant to section 507(a)(8) of the Bankruptcy Code.

61.      Accordingly, for the reasons set forth herein and in the Tax Motion, I respectfully submit the relief requested in the Tax Motion is necessary and critical to the Debtor's ability to preserve value for the benefit of the Debtor's estate, its creditors and parties-in-interest and will enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate. Absent the relief requested in the Tax Motion, the Debtor will suffer immediate

`

and irreparable harm.

**MOTION FOR ENTRY OF ORDER, PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), AND 507(A), AUTHORIZING DEBTOR TO (I) PAY OR HONOR CERTAIN PRE-PETITION DATE EMPLOYEE WAGES, ACCRUED VACATION AND SICK ENTITLEMENTS, BENEFITS, EXPENSES AND OTHER OBLIGATIONS; AND (II) TO CONTINUE EMPLOYEE BENEFIT PROGRAMS ("EMPLOYEE OBLIGATIONS MOTION")**

62.     Pursuant to the Employee Obligations Motion, the Debtor seeks an order authorizing, but not directing, it to pay and/or honor certain obligations owing to the Debtor's employees, including prepetition wages, reimbursable employee expenses, benefits and other obligations (as more specifically set forth and defined in the Employee Obligations Motion, the "Employee Obligations").  The Debtor seeks authority to honor the Employee Obligations as such obligations are critical and essential to employee morale and future business needs.

63.     As of the Petition Date, the Debtor has approximately ten (10) active full-time employees ("Employees").

64.     The Debtor's employees are invaluable to the Debtor's business.  They perform critical functions, consumer order fulfillment, customer service, human resources, and related tasks. Their skills and experience and their relationships with  customers and vendors are essential to the Debtor's ongoing operations and its ability to  effectively operate its business during the Chapter 11 Case.

65.     Due to the devastating impact of the COVID-19 pandemic, the Debtor continually assessed its workforce needs and took steps to minimize costs and adjust to the impact of the outbreak.  As noted above, the Debtor made the difficult decision to shut down all retail locations, and terminate all boutique-based employees.

66.     The Debtor's next payroll is scheduled for September 23, 2021, which payroll will cover the pay period from September 6, 2021 through September 19, 2021. In the ordinary course, the Debtor pays its employees on a bi-weekly basis, via a third-party service provider, iSolved, every other Thursday. Thus, some of the Debtor's next payroll will encompass pre-petition wages owed to the Employees. The Debtor requests authority to pay (via the third-party provider) pre-petition

`

1    employee claims and benefits to the extent that would otherwise be allowed as priority claims under

2    section 507(a)(4) and (a)(5) of the Bankruptcy Code,[3] and to continue to pay post-petition costs

3    associated with the Employee Claims.

4          67.    The Debtor also offers to its eligible employees the opportunity to enroll in a variety

5    of employee benefit plans and policies which include, health insurance, life insurance, paid days off,

6    sick leave, and workers compensation ("Employee Benefit Programs").  As further detailed in the

7    Employee Obligations Motion, the Time Off Policies, the Health Care Plans, COBRA benefits,

8    life insurance plan, and Retirement Program are essential parts of the Debtor's business model.

9          68.    I believe that the failure to grant the relief requested in the Employee Obligations

10   Motion would create instability in the Debtor's Employee workforce and hinder its reorganization

11   efforts, and potentially cause its US customer fulfillment and warehouse operations to shut down,

12   resulting in a substantial loss of revenue to the Debtor.  Absent the Court granting the relief

13   requested, the Debtor's Employees may seek alternative opportunities, perhaps with the Debtor's

14   competitors. The loss of valuable employees would deplete the Debtor's workforce and thereby

15   hinder the Debtor's ability to meet its customer obligations and its ability to successfully preserve its

16   going-concern value. It would also injure employee morale and loyalty during the Debtor's

17   reorganization process, a time when the Debtor especially needs to preserve Employees' morale.

18         69.    Further, most Employees rely on their compensation and benefits to satisfy their

19   living expenses and healthcare.  Particularly in light of the ongoing pandemic, the Employees

20   would be exposed to significant financial difficulties and health issues if the Debtor is not

21   permitted to honor its obligations for unpaid compensation, benefits, and reimbursable expenses.

22         70.    Additionally, in order to enable the relief requested in the Employee Obligations

23   Motion, the Debtor also requests that the Debtor and US Bank, be authorized to receive, process,

24   honor and pay all of the Debtor's prepetition checks and fund transfers on account of any

25   Employee Obligations through the Debtor's pre-petition Main Operating Bank Account maintained at

26   US Bank, and prohibiting the bank from placing any holds on, or attempting to reverse, any

27
───────────────────
[3] All of the Debtor's employees are owed less than the $13,650.00 threshold set forth in section 507(a)(4) of the
28   Bankruptcy Code. Thus, the Employee Obligations Motion is not requesting authorization to compensate employees in
     excess of this this amount.

`

automatic transfers to any account of an Employee or any other party related to the Employee Obligations, without any duty of further inquiry and without liability for following the Debtor's instructions.

71.     For the reasons set forth herein and in the Employee Obligations Motion, I respectfully submit that the relief requested in the Employee Obligations Motion is necessary and critical to the Debtor's ability to preserve value for the benefit of Debtor's estate, its creditors and parties-in-interest, and will enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate. Absent the relief requested in the Employee Obligations Motion, the Debtor will suffer immediate and irreparable harm.

## DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO (I) MAINTAIN CERTAIN CUSTOMER PROGRAMS; (II) HONOR OR PAY RELATED PREPETITION OBLIGATIONS IN RESPECT THEREOF; (III) DIRECT DEBTOR'S PAYMENT PROCESSORS TO HONOR MERCHANT AGREEMENT PENDING ASSUMPTION OR REJECTION; AND (IV) GRANTING RELATED RELIEF ("CUSTOMER PROGRAM MOTION")

72.     Through the Customer Program Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor, in its business judgment, to (i) honor and maintain prepetition Customer Programs (defined below); (ii) pay and honor related prepetition obligations to their customers; (iii) pay any prepetition Processing Obligations (defined below) to the Payment Processors (defined below) in connection with processing Non-Cash Payments (defined below) and directing the Payment Processors to honor the Merchant Agreements (defined below) pending the Debtor's assumption or rejection of said agreement; and (iv) granting related relief.

73.     The Debtor provides certain accommodations and incentives to its customers to attract an expansive customer base and cultivate loyalty. As detailed more fully in the Customer Program Motion, the Debtor's customer programs include a Return and Exchange Policy, a Gift Card Program, and various Coupons and Sales Promotions (collectively, the "Customer Programs"). The Debtor estimates that, as of the Petition Date, there are approximately $526,614in outstanding obligations under the Gift Card Program. These programs require no cash outlay by the Debtor.

`

74.    I believe that continuing to honor the Customer Programs during the Chapter 11 Case is vital to protect the Debtor's valuable customer relationships and goodwill, thus preserving the Debtor's value to the benefit of the Debtor's estate, its creditors, and all parties-in-interest. The Customer Programs are designed to attract additional customers and cultivate loyalty, which is extremely important as the Debtor navigates through chapter 11. Accordingly, I respectfully submit that the Customer Programs are necessary and critical to the Debtor's ability to preserve value for the benefit of Debtor's estate, its creditors and parties-in-interest and will enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate. Absent the relief requested in the Customer Program Motion, the Debtor will suffer immediate and irreparable harm.

75.    Additionally, the Debtor accepts payments at online points of sale only ("Non-Cash Payments") through a variety of credit cards as well as PayPal, and Amazon Pay. To process Non-Cash Payments, the Debtor is a party to or a beneficiary of affiliate agreements ("Merchant Agreement(s)") with Adyen B.V., AmEx, PayPal, and Afterpay (collectively, "Merchant Service Providers"). Non-Cash Payments comprise a significant portion of the Debtor's revenue, particularly as internet sales have risen since the start of the COVID-19 pandemic. It is thus critical that the Debtor be able to pay any prepetition processing-related obligations and continue uninterrupted its relationship with the Merchant Service Providers under the existing Merchant Agreements.

76.    Under the Merchant Agreements, the Merchant Service Providers charge processing fees ("Processing Fees") for the various transactions subject to the terms of the Merchant Agreements. The Processing Fees range depending on the price tier of the transaction. The Merchant Service Providers also charge an acquiring fee ("Acquiring Fee") which is calculated on a tiered structure based on monthly volume. The Debtor and the Merchant Service Providers have also executed "Acquiring Addendums" with US Bank National Association ("US Bank"), relating to the processing services under the Merchant Agreements (collectively, the Merchant Service Providers and US Bank are the "Payment Processors").

20

`

77. The Merchant Agreements contemplate situations where the Payment Processors are obligated to process a refund or return. These transactions are subject to certain adjustments ("Chargeback Fees," and together with the Processing Fees and Acquiring Fees, the "Processing Obligations").  It is imperative that the Debtor continue to accept Non-Cash Payments in order to successfully operate its business.

78. Historically, much of the Debtor's sales were made using Non-Cash Payments.  As the Debtor has shuttered its retail locations, all purchases will be made online which means that all the Debtor's sales for the foreseeable future will be made using Non-Cash Payments.  In order to avoid disrupting these vital payment processing services, the Debtor seeks the authority to pay any prepetition Processing Obligations incurred in connection with processing any Non-Cash Payments and to continue paying Processing Obligations in the ordinary course of business.  In addition, if Payment Processors receive Chargeback Fees above a certain threshold, they may immediately, and without notice, withhold funds to the Debtor in reserve funds to protect themselves against future Chargeback Fees, or worse still, refuse to honor future customer transactions, either of which potential scenarios, would potentially significantly harm and disrupt the Debtors business.

## DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING  (I)  REJECTION OF CERTAIN  UNEXPIRED  LEASES  OF  NONRESIDENTIAL  REAL  PROPERTY PURSUANT  TO  11  U.S.C.  §  365  AND  FED.  R.  BANKR.  P.  6004  AND  6006,  EFFECTIVE AS OF THE PETITION DATE; (II) ABANDONMENT OF PERSONAL  PROPERTY, EFFECTIVE  AS OF THE PETITION DATE, AND (III) GRANTING RELATED  RELIEF ("LEASE REJECTION MOTION")

79. The Debtor seeks entry of an order, authorizing the Debtor to (a) reject certain unexpired leases of non-residential real property, any amendments, modifications, or subleases thereto (each, a "Lease" and collectively, the "Leases"), a list of which is annexed as the Schedule to Exhibit "1" attached to the Lease Rejection Motion, (b) abandon certain equipment, fixtures, furniture, or other personal property that may be located at the premises (collectively the "Personal Property"), both rejection of Leases and abandonment of Personal Property to be effective as of the Petition Date, and (c) granting related relief.

`

80.     Prior to the Petition Date, the Debtor and its advisors began a comprehensive review and store-by-store analysis of its lease portfolio and the performance of each of its stores analyzing various aspects of the Debtor's operations in connection with the Debtor's restructuring efforts. An integral part of this analysis included evaluating the profitability of the Debtor's unexpired leases and identifying and shedding unnecessary and burdensome leases. Based on this analysis, the Debtor has identified all of its retail store leases as burdensome that it wishes to reject at the outset of its Chapter 11 case for the benefit of the Debtor and its estate.

81.     The Leases to be rejected provide no benefit to the Debtor's estate or the Chapter 11 case. Due to the COVID-19 pandemic, like most retail establishments, the Debtor's online sales have been increasing while its brick-and-mortar sales have been in a steady decline. By rejecting the Leases, the Debtor believes that it will save significant dollars per month in rent and associated costs. Absent rejection, the Debtor would be obligated to pay rent under the Rejected Leases even though they will have ceased operations at, and will no longer be in possession of, such locations.

82.     In addition to the payment of rent, the Debtor may be obligated under the Rejected Leases to pay certain real property taxes, insurance, utilities, and other charges. The Debtor has vacated the stores identified in the Lease Rejection Motion as of the Petition Date.   Therefore, in an effort to reduce unnecessary post-petition rent and administrative costs, the Debtor has determined, in its reasonable business judgment, that it is in its best interest of its estate to reject the Rejected Leases set forth on the Schedule, effective as of the Petition Date.

83.     Prior to the Debtor vacating the stores for the Rejected Leases, the Debtor has reviewed and evaluated the fixtures, fittings, furniture, or other personal property remaining at the premises  ("Personal Property") to determine whether (i) the Personal Property is of inconsequential value or (ii) the cost of removing and storing the Personal Property for future use, marketing or sale  exceeds its value to the Debtor's estate.

84.     The Debtor has determined that the Personal Property is of inconsequential value or a burden to  the Debtor's estate.  Accordingly, the Debtor has decided, in its business judgment, to abandon it. Therefore,  to reduce the post-petition administrative costs and in the exercise of its

sound business judgment, the Debtor believes that abandonment of the Personal Property as of the Petition Date is appropriate and in the best interest of the Debtor, its estate and its creditors.

85.    Accordingly, for the reasons set forth herein and in the Lease Rejection Motion, I respectfully submit that relief requested in the Lease Rejection Motion is necessary and critical  to the Debtor's ability to preserve value for the benefit of Debtor's estate, its creditors and parties-in-interest and will enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate. Absent the relief requested in the Lease Rejection Motion, the Debtor will suffer immediate and irreparable harm.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 16th day of September 2021 at Orange County, California.

_____

Richard Munro

EXHIBIT 1

**RICHARD MUNRO**
**RESTRUCTURING EXPERT, RECEIVER and FIDUCIARY**
27481 Ganso
Mission Viejo, CA 92691
T: (949) 910-6600
E: richard@invenz.com
W: www.invenz.com



Richard Munro has 30 years' experience bringing effective problem solving and leadership to growth, distressed & underperforming businesses, & transforming mediocrity into peak performance, measured by outstanding growth in revenue & market share, profits, return on capital employed, & value to shareholders, lenders and creditors.  His experience includes senior executive positions as CEO, CFO, COO, & CRO, Court Appointed Receiver, Provisional Director, Court Expert, leading business orderly wind downs & liquidations, & has served as a Director on public, PE & private company boards.  Richard is recognized as being very effective in identifying & solving problems that create business underperformance & financial distress, & quickly implementing practical operational solutions for profitable growth & recoveries for lenders & creditors. He combines the unique experiences of a CEO & CFO & has extensive successful experience in growing the top line & bottom line in companies with a strong focus on managing operations & increasing cashflow & enterprise value.

His experience spans various healthcare providers, multi-unit specialty retailers, restaurants, food, nutritional supplements, apparel, manufacturing, consumer products, energy, distribution, professional services & not for profit organizations.  Representative engagements include:

- Orderly wind down and liquidation of many businesses, prior to dissolution.

- Provisional Director – Court appointed as tie breaking director of a plastics vacuum forming company.

- Provisional Director – Court appointed oversight over the dissolution of an engineering services company

- Receiver: Direct Marketing Companies – Consumer direct marketing & print media

Appointed Receiver in CA Court over 2 operating businesses in litigation over investor/owner disputes.

- Receiver: Medical Group – Breast surgery & radiology, preventative, diagnostic & surgery care

Appointed Receiver in CA Court; in 90 days had 2 all cash unconditional offers, Court approval to sell the assets in 120 days, and returned to the secured lender 4.2 times their best cash recovery estimate.

- Receiver: Medical and Dental Clinics – HRSA regulated FQHC Look-Alike Clinics

Appointed Receiver in CA Court to take over all medical and dental operations & restore the organization to full Federal & State compliance, constitute a new Board of Directors & management structure.

- CEO: 90 year old publicly traded nutritional supplements company

Led this company into, & through a Chapter 11 reorganization to a confirmed Plan & maintained full SEC reporting.  In 16 months, increased revenue 35% & doubled revenues from largest customer, Sam's Club.

- Chief Restructuring Officer (CRO): Hispanic consumer snacks manufacturer and distributor

In 9 months, increased revenue 30%, gross margin by 4 percentage points, EBITDA by 75%, & manufacturing productivity by 40%.

Richard holds a Master of Business Administration degree in business strategy, a Bachelor's in Accounting and Management Information Systems, is a licensed Chartered Accountant (CA), & holds a California Real Estate Broker License BRE: 01900072.

Richard is a member of AICPA, a Board Leadership Fellow and Directorship Certified by the National Association of Corporate Directors and President/CEO of the NACD Pacific Southwest Chapter, Councilor and Officer of the California Receivers Forum LA/OC Chapter, and Director of a fast growth private equity owned company.  He is a former Board & Audit Committee member of Naturade Inc. (NRDC:OTCBB), and a former Board & Audit Committee member of Orange county Headstart, Inc.

`

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF RICHARD MUNRO IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 16, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐       Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐       Service information continued on attached page

**3.  SERVED BY OVERNIGHT MAIL, OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 16, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒       Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 16, 2021 | Jeannie Martinez | /s/ Jeannie Martinez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

24

`

### PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF RICHARD MUNRO IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 16, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Richard H Golubow    rgolubow@wghlawyers.com, jmartinez@wghlawyers.com; mweinberg@wghlawyers.com
- Dare Law    dare.law@usdoj.gov
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

**3.  SERVED BY EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 16, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒    Service information continued on attached page

**4.  SERVED BY OVERNIGHT MAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 17, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 16, 2021 | Jeannie Martinez | /s/ Jeannie Martinez |
|---|---|---|
| Date | Printed Name | Signature |

`

| | | |
|---|---|---|
| **1** | United States Trustee<br>915 Wilshire Blvd., Suite 1850<br>Los Angeles, CA 90017 | Lorna Jane USA, Inc.<br>1475 W. 139th St<br>Gardena, CA 90249 | **LORNA JANE – Landlords - 20 LARGEST– UST –**<br>**SECURED – RSN - NEF** |
| **2** | | | |
| **3** | | | |
| **4** | US Small Business Administration<br>Attn:  Ben Raju, District Director<br>425 Walnut Street<br>Cincinnati, OH 45202<br>**lado@sba.gov** | Macerich Santa Monica LP<br>Hayley Rable  VP Leasing<br>395 Santa Monica Place<br>Santa Monica, CA 90401<br>**Hayley Rable VP, Leasing Macerich**<br>**Hayley.Rable@macerich.com** | Carlsbad Premium Outlets, LLC<br>Rocky McMurtray<br>5620 Paseo del Norte<br>Suite 100<br>Carlsbad, CA 92008<br>**rmcmurtrav@simon.com** |
| **5** | | | |
| **6** | | | |
| **7** | Bellevue Square, LLC<br>Attn: Corp Officer/Manager<br>Jana Koeberle<br>Post Office Box 908<br>Bellevue, WA 98009<br>**jana.koeberle@kemperdc.com** | Sherman Oaks Fashion Assc, LP<br>Virginia Bergman Loo<br>11601 Wilshire Boulevard, 11th Fl.<br>Los Angeles, CA 90025<br>**virginia.bergmanloo@urw.com**<br>**Virginia Bergman Loo - VP, Business Affairs** | Valencia Town Ctr  Venture LP<br>Attn: Virginia Bergman Loo<br>2049 Century Park East, 41st Floor<br>Los Angeles, CA 90067<br>**virginia.bergmanloo@urw.com**<br>**Virginia Bergman Loo - VP, Business Affairs** |
| **8** | | | |
| **9** | | | |
| **10** | DSC America, Inc.<br>c/o Kennedy Wilson Properties, Ltd<br>151 S. El Camino Drive<br>Beverly Hills, CA 90212<br>Edmond A. Sachse/IandeLaat<br>**idelaat@kennedywilson.com** | Mission Viejo Associates, LP<br>c/o M.S. Managment Associates Inc.<br>225 West Washington Street<br>Indianapolis, IN 46204-3438<br>**Rocky McMurtray**<br>**rmcmurtrav@simon.com** | Biltmore Shopping Center Ptnrs LLC<br>2502 E. Camelback Rd, #216<br>Phoenix, AZ 85016<br>Hayley Rable  VP, Leasing<br>**Hayley Rable VP, Leasing Macerich**<br>**Hayley.Rable@macerich.com** |
| **11** | | | |
| **12** | | | |
| **13** | **20 Largest / Landlord – Manhattan Beach**<br>213 Manhattan Bch Blvd Ptnrs, LLC<br>c/o Cardinal Investments, LLC<br>Attn:  Nicole Fitzgerald<br>Kyle Ransford Cardinal Investments<br>Attn: 2301 Rosecrans Ave., Suite 4194<br>El Segundo, CA 90245<br>**kyle@cardinalinvestments.com** | The Retail Property Trust<br>c/o M.S. Management Associates Inc<br> 225 West Washington Street<br>Indianapolis, IN 46204-3438<br>**Rocky McMurtray**<br>**rmcmurtrav@simon.com** | The Irvine company, LLC<br>Attn: Kenneth M. Gillett, Sr. VP<br>110 Innovation<br>Irvine, CA 92617<br>**kengillett@irvinecompany.com** |
| **14** | | | |
| **15** | | | |
| **16** | Century City Mall, LLC<br>Virginia Bergman Loo, VP<br>2049 Century Park East, 41st Floor<br>Los Angeles, CA 90067<br>Legal Dpt<br>**virginia.bergmanloo@urw.com**<br>**Virginia Bergman Loo - VP, Business Affairs** | Premium Outlet Partners LP<br>c/o Simon Property Group<br>225 West Washington Street<br>Indianapolis, IN 46204-3438<br>**Rocky McMurtray**<br>**rmcmurtrav@simon.com** | Irvine Spectrum Center, LLC<br>Attn: Kenneth M. Gillett, Sr. VP<br>110 Innovation<br>Irvine, CA 92617<br>Kenneth M. Gillett Senior Vice Pre<br>**kengillett@irvinecompany.com** |
| **17** | | | |
| **18** | | | |
| **19** | Avalara Inc.<br>Attn:  Corporate Officer<br>Dept CH 16781<br>Palatine<br>Palatine, IL 60055<br>**accountsreceivable@avalara.com** | UTC Venture, LLC<br>Attn: Virginia Bergman Loo<br>2049 Century Park East, 41st Floor<br>Los Angeles, CA 90067<br>**virginia.bergmanloo@urw.com**<br>**Virginia Bergman Loo - VP, Business Affairs** | Rakuten Marketing<br>PO Box 415613<br>Boston, MA 02241-5613<br>**Attn:  Corporate Officer/Manager**<br>**rm-remittance-advice@rakuten.com** |
| **20** | | | |
| **21** | | | |
| **22** | **Secured**<br>Bellevue Square LLC<br>575 Bellevue Square 1085<br>Bellevue, WA 98004 | Santa Anita Fashion Park LLC<br>11601 Wilshire Boulevard 11th Floor<br>Los Angeles, CA 90025<br>**virginia.bergmanloo@urw.com**<br>**Virginia Bergman Loo - VP, Business Affairs** | Berkshire Hathaway  Homestate Co.<br>Attn: Michelle Briggs<br>P.O. Box 844501<br>Los Angeles, CA 90084<br>**bhhcclaim@bhhc.com**<br>**propertv@bhhc.com** |
| **23** | | | |
| **24** | | | |
| **25** | **Secured**<br>Kemper Development Company<br>Atn:  Jana Koeberle, Sr. VP Leasing<br>575 Bellevue Square, #1085<br>Bellevue, WA 98004<br>**jana.koeberle@kemperdc.com** | **NEF Service List**<br>United States Trustee<br>915 Wilshire Blvd., Suite 1850<br>Los Angeles, CA 90017 | US Bank<br>John K. Wong<br>VP Deposit/Payment Relationship Manager<br>US Bank Tower, Los Angeles<br>633 W. Fifth St., Floor 30,<br>Los Angeles, CA, 90071<br>**john.wong@usbank.com** |
| **26** | | | |
| **27** | | | |
| **28** | | | |

`

| | | |
|---|---|---|
| 1 | Paypal, Inc –<br>2211 N 1st St,<br>San Jose, CA 95131<br>**(Kumarika Chaudhuri Senior Director - Global**<br>**Customer Operations and Site Head**<br>**service@paypal.com; jrainey@paypal.com** | Adyen BV<br>Carmiggelstraat 6-50<br>1011 DJ<br>Amsterdam, Netherlands<br>**(Australian Account Manager)**<br>**livoi.wendo@adyen.com** | American Express<br>431 Waverley St,<br>Palo Alto, CA United States<br>**Scott Stirrup – Client Manager Global Merchant**<br>**and Network Services**<br>**scott.stirrup@aexp.com** |

**LANDLORD – STORE 7777-150**
Bella Terra Associates, LLC
c/o DJM Capital Partners
Attention: Eric Sahn
60 South Market Street, Suite 1120
San Jose, CA 95113
Grace Huang - General Manager -
**ghuang@djmcapital.com**

Afterpay USA, Inc –
222 Kearny Street, 6TH Floor
San Francisco, CA 94108
**(Australian Account Manager)**
**ryan.montgomery@afterpay.com**

**Counsel for Bellevue**
Brian M. Muchinsky
NOLD  MUCHINSKY
10500 NE 8th Street, Suite 930
Bellevue, WA  98004
Phone: 425-289-5555
**Brian Muchinsky - bmuchinsky@noldmuchlaw.com**

**LANDLORD – STORE 1085**
Bellevue Square, LLC
Attention: Corporate Officer
Post Office Box 908
Bellevue, Washington 98009
Jana Koeberle
Senior Vice President Leasing - Kemper Development Company
**jana.koeberle@kemperdc.com**

**LANDLORD – STORE 181**
Biltmore Shopping Center Partners LLC
c/o Macerich - Attention: Legal Department
P.O. Box 2172
401 Wilshire Boulevard, Suite 700
Santa Monica, California 90407
**Hayley.Rable@macerich.com**

**LANDLORD – STORE 2755**
Century City Mall, LLC
Attention: Legal Department
2049 Century Park East, 41st Floor
Los Angeles, California 90067
**virginia.bergman.loo@urw.com**
**Virginia Bergman Loo - VP, Business Affairs**

**LANDLORD – STORE 134**
City Creek Center Associates LLC
Attention: Corporate Officer
P.O. Box 674566
Detroit, MI 48267-4566
**Francesca A. Lousia - Senior Attorney,**
**Lease Compliance Taubman –**
**flousia@taubman.com**

**LANDLORD – STORE 73-655**
El Paseo Premier Centre
Attention: Corporate Officer
5900 Wilshire Boulevard, Suite 400
Los Angeles, California 90036
**Amy Smith - Senior Vice President**
**Chartwell Properties, Inc.**
**asmith@chartwellproperties.net**

**LANDLORD – STORE 751**
Irvine Spectrum Center LLC
Attention: General Counsel, Retail Properties
The Irvine Company LLC
110 Innovation
Irvine, California 92617
**Kenneth M. Gillett - Senior Vice President, Operations**
**Irvine Company Retail Properties**
**kengillett@irvinecompany.com**

**LANDLORD – STORE 150C1B**
Kierland Greenway, LLC
c/o Macerich
Attention: Legal Department
P.O. Box 2172
401 Wilshire Boulevard, Suite 700
Santa Monica, California 90407
**Hayley Rable VP, Leasing Macerich**
**Hayley.Rable@macerich.com**

**LANDLORD – STORE 100**
Macerich Santa Monica LP
c/o Macerich
Attention: Legal Department
P.O. Box 2172
401 Wilshire Boulevard, Suite 700
Santa Monica, California 90407
**Hayley Rable VP, Leasing Macerich**
**Hayley.Rable@macerich.com**

**LANDLORD – STORE 12D**
Mission Viejo Associates, L.P.
c/o M.S. Management Associates Inc.
Attention: Legal Department
225 West Washington Street
Indianapolis, Indiana 46204-3438
**Rocky McMurtray Leasing Simon**
**rmcmurtray@simon.com**

**LANDLORD – STORE 2R1-2248**
Northpark Partners LP
Attention: Corporate Officer
8080 North Central Expressway, Suite 1100
Dallas, TX 75206
**Angela Boots Director of Leasing**
**NorthPark Center**
**aboots@northparkcntr.com**

**LANDLORD – STORE 1012**
Premium Outlet Partners LP
c/o Simon Property Group
Attention: Corporate Officer
225 West Washington Street
Indianapolis, Indiana 46204-3438
**Rocky McMurtray - Leasing Simon**
**rmcmurtray@simon.com**

**LANDLORD – STORE 1200**
Santa Anita Fashion Park LLC
Attention: Legal Department
11601 Wilshire Boulevard, 11th Floor
Los Angeles, California 90025
**Virginia Bergman Loo VP, Business Affairs**
**Unibail-Rodamco-Westfield**
**virginia.bergmanloo@urw.com**

**LANDLORD – STORE 36**
Sherman Oaks Fashion Associates LP
Attention: Legal Department
11601 Wilshire Boulevard, 11th Floor
Los Angeles, California 90025
**Virginia Bergman Loo VP, Business Affairs**
**Unibail-Rodamco-Westfield**
**virginia.bergmanloo@urw.com**

**LANDLORD – STORE 807**
The Irvine Company LLC
Attention: General Counsel, Retail Properties
The Irvine Company LLC
110 Innovation
Irvine, California 92617
**Kenneth M. Gillett Senior Vice President, Operations**
**kengillett@irvinecompany.com**

**LANDLORD – STORE 1106**
The Retail Property Trust
c/o M.S. Management Associates Inc.
Attention: Legal Department
225 West Washington Street
Indianapolis, Indiana 46204-3438
**Rocky McMurtray – Leasing Simon**
**rmcmurtray@simon.com**

**LANDLORD – STORE**
Union Street Property Trust 1
Attention: Corporate Officer
63 Paul Avenue
San Rafael, California 94903
**Reno D Rossi -**
**renorossi@marincheese.com**

**LANDLORD – STORE E25**
UTC Venture LLC
Attention: Legal Department
2049 Century Park East
41st Floor
Los Angeles, California 90067
**Virginia Bergman Loo VP, Business Affairs**
**Unibail-Rodamco-Westfield**
**virginia.bergmanloo@urw.com**

**LANDLORD – STORE 2730**
Valencia Town Center Venture, L.P.
Attention: Legal Department
2049 Century Park East
41st Floor
Los Angeles, California 90067
**Virginia Bergman Loo VP, Business Affairs**
**Unibail-Rodamco-Westfield**
**virginia.bergmanloo@urw.com**

**LANDLORD – STORE 316**
Westcor Santan Village LLC Santan
c/o Macerich
Attention: Legal Department
P.O. Box 2172
401 Wilshire Boulevard, Suite 700
Santa Monica, California 90407
**Hayley Rable VP, Leasing Macerich**
**Hayley.Rable@macerich.com**

26